No. 24-50829

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

V.

TIFFANY FULLERTON,
*Defendant-Appellant.*

On Direct Appeal from the United States District
Court for the Western District of Texas
Austin Division

## APPELLANT'S BRIEF

JESSICA GRAF
JESSICA GRAF, PLLC
TX BAR NO. 24080615
11430 Quaker Ave
Ste 200 PMB 1027
Lubbock, TX 79424
806-370-8006
jessica@jessicagraflaw.com

*Counsel for Ms. Fullerton*

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualifications or recusal.

| | |
|---|---|
| **District Judge:** | The Honorable Robert Pitman |
| **Magistrate Judge:** | The Honorable Mark Lane |
| | The Honorable Dustin M. Howell |
| | The Honorable Susan Hightower |
| **Appellant:** | Tiffany Lynn Smith Fullerton |
| **Defense Counsel:** | Jessica Graf (appeal) |
| | Novert A. Morales |
| | Victor Arturo Arana |
| | John N. de la Vina |
| **United States Attorney for the Western District of Texas:** | Margaret Leachman |
| **Assistant U.S. Attorneys:** | Zachary C. Richter |
| | G. Karthik Srinivasan |
| | Joseph H. Gay, Jr. |
| | Keith Mason Henneke |
| | Kristy Karen Callahan |
| | Mark Tindall |
| | Robert Almonte |
| | Warren R. Kaufman |

/s/ Jessica Graf

ii

## STATEMENT REGARDING ORAL ARGUMENT

I request oral argument. This appeal stems from a complex fraud trial and involves an issue that the district court noted needs further guidance from this Court. Oral argument would help the Court resolve these issues.

## TABLE OF CONTENTS

Certificate of Interested Persons ..................................................................................ii

Statement Regarding Oral Argument ..........................................................................iii

Table of Contents ........................................................................................................ iv

Table of Authorities.................................................................................................... vi

Statement of Jurisdiction............................................................................................. 1

Issues Presented For Review........................................................................................ 2

Statement of the Case................................................................................................... 3

    I.    Tiffany and Michael Fullerton opened two auto repair shops before filing for bankruptcy. ....................................................................................... 3

    II.   Michael Fullerton and David Starkes conspired to fraudulently obtain multiple PPP loans in April and May of 2020. ................................................ 5

    III. The investigation into the PPP loans prompted Michael Fullerton to move the money. ..................................................................................... 8

    IV. At trial, Tiffany Fullerton argued she was unaware of her husband's fraudulent scheme. ............................................................................... 10

    V.   The district court imposed an obstruction of justice enhancement after finding that Tiffany willfully procured Michael's false testimony. .............. 15

    VI. The district court denied the defense's Motion for New Trial based on new evidence that Michael Fullerton tricked his ex-wife into participating in a fraudulent scheme. ........................................................ 18

Summary of the Argument .........................................................................................20

Argument ...........................................................................................................22

I.   The district court abused its discretion when it denied Tiffany Fullerton's
     Motion for New Trial...............................................................................22

     A.   Standard of Review .......................................................................22

     B.   Tiffany was not required to investigate Michael's 1996 divorce to
          exercise due diligence.....................................................................23

     C.   Evidence that Michael tricked his ex-wife into assisting in a
          fraudulent scheme was material........................................................24

     D.   Michael's ex-wife's testimony is admissible. ...................................25

II.  The district court erroneously found that Tiffany willfully procured
     Michael's perjured testimony...................................................................26

     A.   Standard of Review .......................................................................26

     B.   Knowledge that a witness will give false testimony is not obstruction
          of justice......................................................................................27

III. The district court erred when it included the Starx Investment PPP loan
     in the loss calculation..............................................................................30

     A.   Standard of Review .......................................................................30

     B.   The Starx Investment loan doesn't qualify as relevant conduct
          because it occurred before Tiffany joined the conspiracy........................31

Conclusion..........................................................................................................34

Certificate of Service...........................................................................................35

Certificate of Compliance ...................................................................................36

TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Petite v. United States,*
    262 F.2d 788 (4th Cir. 1959)................................................................29

*United States v. Carreon,*
    11 F.3d 1225 (5th Cir. 1994)..............................................................33

*United States v. Cohen,*
    888 F.2d 770 (11th Cir. 1989)............................................................26

*United States v. Dunnigan,*
    507 U.S. 87 (1993) ..............................................................................28

*United States v. Flanagan,*
    484 F. App'x 973 (5th Cir. 2012) ......................................................28

*United States v. Graves,*
    5 F.3d 1546 (5th Cir. 1993)................................................................28

*United States v. Johnson,*
    352 F.3d 146 (5th Cir. 2003)..............................................21, 29, 31

*United States v. Jones,*
    475 F.3d 701 (5th Cir. 2007)..............................................................32

*United States v. Kilgarlin,*
    157 F. App'x 716 (5th Cir. 2005) ......................................................30

*United States v. Le,*
    512 F.3d 128 (5th Cir. 2007)..............................................................27

*United States v. Leonard-Allen,*
    739 F.3d 948 (7th Cir. 2013)..............................................................27

*United States v. Lesczynski*,
    86 F. App'x 551 (4th Cir. 2004) ............................................................... 30

*United States v. Longstreet*,
    603 F.3d 273 (5th Cir. 2010) .................................................................. 35

*United States v. Lowder*,
    148 F.3d 548 (5th Cir. 1998) .................................................................. 31

*United States v. Luffred*,
    911 F.2d 1011 (5th Cir. 1990) .................................................... 25, 26, 27

*United States v. Nachamie*,
    101 F. Supp. 2d 134 (S.D.N.Y. 2000) ..................................................... 26

*United States v. Piazza*,
    647 F.3d 559 (5th Cir. 2011) .................................................................. 24

*United States v. Statin*,
    367 F. App'x 492 (5th Cir. 2010) ........................................................... 28

*United States v. Wall*,
    389 F.3d 457 (5th Cir. 2004) .................................................................. 23

## Federal Rules

Fed. R. Evid. 401 ............................................................................................ 27

## United States Sentencing Guidelines

USSG § 1B1.3 .......................................................................................... 22, 33

USSG § 2B1.1 ..................................................................................... 22, 32, 35

USSG § 3C1.1 ................................................................................................ 28

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

The district court entered its final judgment on October 7, 2024. (ROA.376). Ms.

Fullerton filed a timely notice of appeal on October 17, 2024. (ROA.405).

## ISSUES PRESENTED FOR REVIEW

I.  The central question at trial was whether Tiffany Fullerton knew she was participating in a fraudulent scheme when she opened bank accounts and moved money at her husband's request. Did the district court err by denying her Motion for New Trial based on newly discovered evidence that Michael Fullerton had used his unwitting ex-wife to pull off fraud in the past?

II. Is an obstruction of justice guideline enhancement appropriate when the defendant called a witness to the stand knowing they would give false testimony but did not otherwise induce or convince them to give that testimony?

III. Did the district court err by including in the actual loss amount a fraudulent loan obtained before Tiffany Fullerton joined the conspiracy?

STATEMENT OF THE CASE

Michael Fullerton and David Starkes were the masterminds behind a fraudulent PPP loan scheme. They pled guilty to it. Michael's wife, Tiffany Fullerton, unquestionably assisted the scheme by opening bank accounts and moving funds. The only question was whether she knew she was part of a fraudulent scheme when she took these actions.

**I.    Tiffany and Michael Fullerton opened two auto repair shops before filing for bankruptcy.**

Tiffany Smith was a single mom of two boys when she met Michael Fullerton in September 2014.[1] (ROA.5130). Tiffany was operating a daycare out of her home while Michael worked as an automobile appraiser for insurance companies. (ROA.5130–31). The two married on February 28, 2015, and Michael soon convinced her to shutter the daycare so he could open an auto collision repair shop. (ROA.5133, 5135, 5137–38). A few months later, Michael opened the Hutto, Texas shop with Tiffany acting as his "executive assistant." (ROA.5139–40). Michael instructed Tiffany to open the necessary bank account for the business because he had a prior bank fraud

---

[1] To avoid confusion, this brief refers to Tiffany Fullerton and Michael Fullerton by their first names.

conviction. (ROA.5140–42).

Michael opened a second location in Georgetown, Texas, called Georgetown Collision, and sell the Hutto business. (ROA.5143). The sales process dragged on, creating financial strain for the Fullertons, as they had to continue paying rent on the Hutto location while also operating the Georgetown location. (ROA.5147). Michael and Tiffany filed for Chapter 7 bankruptcy in December 2017 to discharge their debts. (ROA.5148). In June 2018, Michael brought on an old friend, David Starkes, to help run and be the face of Georgetown Collision, as Michael no longer had good relationships with suppliers following bankruptcy. (ROA.5160–61). The two created Starx Investment as part of the transaction, listing Starkes as the President of the company. (ROA.5160–61).

In late 2019, Michael and Starkes planned to split Georgetown Collision into four entities: FCG Automotive as the paint side of the business, MTF Racing for boat and race car repairs and restorations, Fullerton Consulting for the office staff at Georgetown Collision, and Starx Investment for the body shop itself. (ROA.5169–70). All of these entities already existed but most were defunct at the time. (ROA.5171).

4

II.  **Michael Fullerton and David Starkes conspired to fraudulently obtain multiple PPP loans in April and May of 2020.**

Early in the pandemic, the government instituted the Paycheck Protection Program to give businesses loans to cover expenses and salaries. (ROA.4634). The PPP program had certain requirements businesses had to meet to be eligible for a loan, including (1) the business was in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors, (2) that current economic uncertainty made the loan necessary to support ongoing operations, (3) that the funds would be used to retain workers and pay expenses, (4) that the applicant would provide the lender with documentation verifying its employees and payroll costs, and (5) that the applicant would only receive one PPP loan between February 15, 2020, and December 31, 2020. (ROA.4637–39).

Michael and Starkes conspired to submit multiple loan applications supported by fake documents for entities that were not in operation before February 2020 and had no employees or operating costs.

*Starx Investing*

When Starkes became the face of Georgetown Collision in 2018, they created a company called Starx Investment to transfer the assets to Starkes. (ROA.5160–61). Then when the lockdown started in early 2020, Michael and Starkes had a cash flow

5

problem. (ROA.5171–72). They soon learned about the government's paycheck protection loan program, and Starkes promptly applied for a PPP loan for Starx Investment. (ROA.5174). Starkes completed the application by hand and submitted it to First United Bank on April 22, 2020. (ROA.464–91). Michael and Starkes also created fraudulent documents to present to the bank as part of the application. (ROA.5176). The Starx Investment loan was funded for $599,900. (ROA.471).

### Fullerton Consulting Group

Michael next obtained a PPP loan on behalf of Fullerton Consulting Group. Michael created this entity in 2009 and used it during the years he worked as an insurance appraiser. (ROA.5136). When Michael married Tiffany, he added her to the Fullerton Consulting bank account. (ROA.5141).

Michael filled out the PPP loan application electronically using DocuSign to apply e-signatures and submitted fraudulent documents in support of the loan. (ROA.493–97). The application was submitted on April 27, 2020, and the loan was funded for $259,134 on April 29, 2020. (ROA.495, 498). Michael also opened a new bank account at Radius Bank for Fullerton Consulting Group to receive the PPP funds. (ROA.5181).

6

*FCG Automotive*

The next loan application was on behalf of FCG Automotive. (ROA.658). FCG Automotive was registered with the Texas Secretary of State on April 30, 2015, with Tiffany listed as the registered agent. (ROA.735–36). The entity was forfeited January 28, 2018, but was reinstated May 11, 2020, again under Tiffany's name. (ROA.5096).

On May 8, 2020, a PPP loan application was submitted with Tiffany listed as the owner of the company and her name e-signed on the application. (ROA.658, 660). Like the previous application, this one was completed using DocuSign, not a wet signature. (ROA.658–62). Michael claimed responsibility for submitting the application under Tiffany's name and said she knew nothing about it. (ROA.5214). The loan was funded on May 14, 2020, for $500,000. (ROA.660, 663). The money was initially deposited into Tiffany's personal bank account but was immediately moved to a new bank account Tiffany opened for FCG Automotive. (ROA.4705–06).

*MTF Racing*

Next, Michael applied for a loan on behalf of MTF Racing. MTF Racing was formed on September 22, 2016, under Tiffany's name, forfeited January 26, 2018, for failure to file the franchise tax statement, and then reinstated May 11, 2020. (ROA.5097, 5193).

7

Michael submitted the first PPP loan application for MTF Racing on May 26, 2020, listing Joseph Robles, a Georgetown Collision employee, as the owner. (ROA.750–52). The application was completed using DocuSign and Robles's electronic signature was fixed to the application. (ROA.750–54). That one wasn't funded. (ROA.4834). Two more loan applications for MTF Racing were submitted on June 9, 2020, and July 9, 2020. Both were funded, the first for $834,200, and the second for $834,292.11. (ROA.805–62).

The bank account for MTF Racing was opened on May 28, 2020. (ROA.4836). Michael admitted that he sent Robles to open the bank account, but Robles was unsuccessful, so Michael sent Robles back to the bank with Tiffany to help him with the paperwork. (ROA.5233).

**III.    The investigation into the PPP loans prompted Michael Fullerton to move the money.**

The Fullertons began planning to move to Oklahoma, where Michael intended to open a restaurant and a marijuana grow facility. (ROA.5439). In July 2020, the MTF Racing bank account—the one in Robles's name—was frozen. Michael and

Starkes believed this happened because of Robles's child support obligations.[2] (ROA.5243–44). Michael told Robles to fly to Oklahoma to resolve the problem. (ROA.5244). Michael and Tiffany picked Robles up at the airport in Tulsa and drove him to the bank. (ROA.5247). Tiffany and Robles entered the bank and obtained two cashier's checks to empty the account: one for $115,000 and one for $1,000,000. (ROA.5251–52). The smaller check was used to buy Starkes's Toterhome[3] and the larger check was deposited into a new bank account opened by Tiffany and Michael for Fullerton Consulting Group. (ROA.1573, 5359–60, 5351).

Michael and Starkes sold Georgetown Collision in August 2020 for $2,500,000, and the Fullertons officially moved to Oklahoma. (ROA.4919, 5096, 5242). They all became aware of a potential investigation on September 2, 2020, when Treasury Agent Bob Rutherford approached Charles Smith, Tiffany's father, and told him that he might be the victim of identity theft because his name was listed on MTF Racing loan documents. (ROA.4793–94). Tiffany called Agent Rutherford later that

---

[2] The account was actually placed on hold because Starkes attempted to wire $115,000 from the account to purchase a Toterhome, which triggered a fraud alert. (ROA.5242, 5247–48).

[3] A Toterhome is a type of motorhome designed for towing heavy items like race cars and boats.

afternoon and referred him to an attorney. (ROA.4795).

Fearing the IRS would freeze their accounts, Michael directed Tiffany to start moving money. (ROA.5262–63). They pulled all the funds out of the accounts by writing cashier's checks to other entities they owned. (ROA.5099–103, 5263–64).

**IV.   At trial, Tiffany Fullerton argued she was unaware of her husband's fraudulent scheme.**

The government eventually charged Michael and Tiffany Fullerton, David Starkes, and Joseph Robles. (ROA.16–28). Michael carried the bulk of the charges but Tiffany was charged with one count of Conspiracy to Commit Bank and Wire Fraud and one count of Conspiracy to Commit Money Laundering. (ROA.85–97). Starkes, Robles, and Michael Fullerton entered guilty pleas. Tiffany proceeded to trial.

At trial, the government focused on the PPP loans to Fullerton Consulting Group, FCG Automotive, and MTF Racing. To tie Tiffany to the scheme, Agent Rutherford testified that Tiffany's name and e-signature were on the FCG Automotive loan application, Tiffany personally opened FCG Automotive's bank account when the loan funded, and that MTF Racing's EIN number application was submitted by Charles Smith (Tiffany's father). At one point, Tiffany described herself as being part of Georgetown Collision's management team, and Tiffany and Michael listed Fullerton Consulting and FCG Automotive as businesses with zero value in their

10

bankruptcy filings. (ROA.4636, 4647–48, 4656, 4658–59, 4706). When Agent Rutherford interviewed Tiffany, she admitted to moving money between accounts at Michael's request but denied knowing about illegal activity. (ROA.4818).

Agent Rutherford also pointed to text messages between Michael and Starkes where Michael said he would be paying a criminal defense attorney a lot of money because he, Starkes, and Tiffany would need the attorney, and later said he and Tiffany were going to meet PPP lawyers. (ROA.4759–61). He highlighted the extravagant purchases made, including Rolex watches, a race car, and a Toterhome. (ROA.4708). Those items weren't for Tiffany. (ROA.5114).

Joseph Robles testified to how he got involved in the scheme. Robles began working at Georgetown Collision as a porter, or an errand boy. (ROA.4978). He was also part of Michael's boat racing crew in 2018 and towed Michael's expensive racing boat to competitions all over the country. (ROA.5017–20).

He testified that work slowed considerably at the shop at the beginning of the pandemic. (ROA.4980). Robles claimed that the Fullertons had him over for dinner in May 2020 to celebrate Robles's birthday. (ROA.4981). At that dinner, they asked him to use his information to obtain a PPP loan in exchange for $65,000. (ROA.4981–82). But this is not the story Robles initially told Agent Rutherford. He

11

first described speaking to Michael about this on a boat, not with Michael and Tiffany at their home. (ROA.5110).

After he agreed, Michael sent him to the bank to open an account for MTF Racing and gave him the necessary documents. (ROA.4985). For some reason, the bank wouldn't open the account. (ROA.4986). Michael sent Robles back to the bank with Tiffany to open the account and this time he was successful. (ROA.4986–89). Robles also testified about the July 2020 incident where Michael and Starkes believed MTF Racing's account was frozen because Robles owed child support. (ROA.4993). He described flying to Oklahoma and going inside the bank with Tiffany to pull the money out. (ROA.4994–96).

IRS Agent Molly Giles testified about her analysis of the financial records. She tracked the PPP funds between the various accounts and categorized how it was spent. (ROA.5033–35). She also reviewed text messages between Michael and Starkes where Michael stated his attorney would write up an agreement stating that MTF Racing was owned by Michael and Tiffany, and another where Michael stated that Tiffany would pick Robles up from the airport. (ROA.5083–88).

The defense did not try to deny Tiffany's actions. She opened bank accounts and moved funds. But the defense argued that she did not know she was participating

12

in a fraudulent scheme when she did these things. Michael testified that he had Tiffany open bank accounts and put entities in her name as soon as they got married in 2015. (ROA.5140–42). He wanted to keep his name off things due to his bank fraud conviction. (ROA.5140–41).

Michael testified that Tiffany was unaware of the extent of their money problems before 2020 because he didn't tell her. Instead, they often traveled to boat races and went on vacations. (ROA.5164–65). Michael always portrayed that Georgetown Collision was successful, and Tiffany was used to Michael's extravagant spending. (ROA.5165–67). He claimed Tiffany wouldn't have thought anything of opening new accounts for PPP loans or helping Robles because he had asked her to do that kind of thing for years. (ROA.5231). He had sent her to open several corporate bank accounts over the years after teaching her what documents the bank would ask for. (ROA.5429). That's why he sent her to help Robles. Robles didn't know how to identify a document like corporate minutes and she did. (ROA.5429). And when Robles came to Oklahoma to unfreeze and then empty the account, Michael spoke to his attorney on speakerphone about the frozen account in front of Robles and Tiffany as though the funds at issue were legitimate. (ROA.5432).

Michael also testified that Tiffany thought their new business ventures in

13

Oklahoma were funded by his sale of Georgetown Collision for $2,500,000. (ROA.5258). And he lied to Tiffany about why he needed her to help Robles empty the MTF Racing account. He told her he had been putting money from the shop into that account and was worried that Starkes would take it. (ROA.5247). When the Treasury agent showed up at her dad's house, Michael warned Tiffany they were facing an audit, not criminal charges. (ROA.5261). Michael testified that he did not tell Tiffany about the fraud until October 2021. (ROA.5418).

During cross, Michael denied some of the admissions he had agreed to in the factual basis for his guilty plea. Michael claimed he did not conspire with Robles because Robles did not know what was going on when he agreed to let Michael use his personal information. (ROA.5279–83). He also disagreed that Fullerton Consulting Group, MTF Racing, and FCG Automotive were not operating businesses in 2019 or 2020. (ROA.5285–89).

The government pointed out that Michael claimed Tiffany didn't know about the fraud until October 2021, but text messages between Michael and Tiffany suggest otherwise. On December 11th, he texted "you will have money for the rest of your life to do what you want. I will take all the blame for the PPP stuff. I'll do the time if it comes to that." (ROA.5444–45). Michael texted her on December 18, 2020, "one

14

piece of the puzzle that you obviously haven't considered since you left is if I go to prison over this PPP deal, you are now fucked because all this will die with nobody to run it." (ROA.5444).

Finally, the defense called three witnesses to testify to Tiffany's honest character. They also stated Tiffany was extremely ill and often bedridden in 2020 because she has a condition that causes her to repeatedly contract meningitis and, as a result, she was not working at Georgetown Collision very often. (ROA.5450–72).

The jury ultimately found Tiffany not guilty of conspiracy to commit wire fraud but guilty of conspiracy to commit bank fraud and conspiracy to commit money laundering. (ROA.5563).

**V.    The district court imposed an obstruction of justice enhancement after finding that Tiffany willfully procured Michael's false testimony.**

The Presentence Report listed Tiffany's guideline imprisonment range as 87–108 months. (ROA.4048). Probation concluded the actual loss amount for the fraud scheme was $3,027,526.11 and the intended loss as $3,792,651.11. (ROA.4038). The PSR held Tiffany accountable for six PPP loans, including the loans for Starx Investment, Fullerton Consulting Group, FCG Automotive, and MTF Racing:

| Loan | Amount | Date Funded |
|---|---|---|

| Starx Investment | $599,900 | April 22, 2020 |
|---|---|---|
| Fullerton Consulting Group | $259,134 | May 1, 2020 |
| FCG Automotive | $500,000 | May 18, 2020 |
| MTF Racing | $765,125 | Unfunded |
| MTF Racing | $834,200 | June 24, 2020 |
| MTF Racing | $834,292.11 | July 13, 2020 |

(ROA.4037–38).

Probation calculated Tiffany's total offense level as level 29. Eighteen levels were added to the base offense level for bank and wire fraud (which is level seven), two levels added for sophisticated means under USSG § 2B1.1(b)(10)(C), two levels added for sophisticated money laundering under USSG § 2S1.1(b)(3)(A), (B), and two levels were subtracted because Tiffany is a Zero-Point Offender. (ROA.4038–39).

The defense objected, arguing, among other things, that the loss amount should not include the Starx Investment loan because she was not charged with that loan and the government did not put on evidence that it was fraudulently obtained.

16

(ROA.4056). The government responded that the Starx loan qualifies as relevant conduct because it was part of the same scheme to fraudulently obtain PPP loans. (ROA.4061).

Before sentencing, the district court issued a Notice to the parties that it expected argument over whether it should impose the USSG § 3C1.1 adjustment to Tiffany's guideline range for suborning perjury when she called Michael as a witness at trial. (ROA.368). Defense counsel submitted a sentencing memorandum on the subject arguing the obstruction enhancement should not apply because Michael Fullerton did not give false testimony on a material matter and, even if he did, there is no evidence that Tiffany willfully procured that testimony. (ROA.370–74).

At the sentencing hearing, the defense argued there was not enough evidence that Tiffany willfully procured false testimony. After Michael entered a guilty plea, Tiffany's attorneys met with Michael and Michael's attorneys and learned what his testimony would be. (ROA.5593–94). Citing *United States v. Johnson*, 352 F.3d 146 (5th Cir. 2003), defense counsel argued the defendant must do more than call a witness to procure false testimony. (ROA.5584). The district court acknowledged there isn't "a case exactly" on point and noted "the Fifth Circuit perhaps needs to look at" the issue. (ROA.5591–92). Still, the court determined it was enough that

17

Tiffany called Michael as a witness knowing he was going to lie. (ROA.5592).

The district court ultimately overruled all the objections and determined the guideline range is 108–135 months of imprisonment. (ROA.5618–19). The court sentenced Tiffany to 108 months of imprisonment, three years of supervised release, and restitution in the amount of $3,027,526.11. (ROA.5641–42).

**VI.  The district court denied the defense's Motion for New Trial based on new evidence that Michael Fullerton tricked his ex-wife into participating in a fraudulent scheme.**

After sentencing, the defense learned that Michael Fullerton's PSR included information indicating that he had previously hoodwinked his ex-wife into participating in a fraudulent scheme. In 1998, Michael was charged with bank fraud in the Northern District of Texas. *United States v. Fullerton*, No. 4:98-CR-00132-Y (N.D. Tex. 1998) (ECF Doc. 3). He pleaded guilty and was sentenced to 18 months of imprisonment. Two years earlier, in 1996, Michael's then-wife Lisa Clyburn filed for divorce. (ROA.384). During a deposition in May 1996, Clyburn stated that Michael ordered her to sign checks and other documents regarding their business but did not tell her what was going on. (ROA.384–85). He also became increasingly abusive. (ROA.385). Based on this information, Tiffany filed a Motion for New Trial under Federal Rule of Criminal Procedure 33(b)(1), arguing this was newly discovered

evidence or, in the alternative, *Brady* material because the government learned of it before her sentencing. (ROA.383–85).

The district court denied the Motion for New Trial without an evidentiary hearing. (ROA.400). The court applied "the *Berry* rule," which requires the defendant to demonstrate (1) the evidence is newly discovered and was unknown to the defendant at the time of trial, (2) the failure to detect the evidence was not due to the defendant's lack of diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, and (5) the evidence would probably produce an acquittal if introduced at trial. (ROA.413–14) (citing *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011)). Finding that the defense failed to exercise due diligence, the evidence is not material and not likely to produce an acquittal, and the evidence would not be admissible at trial, the court denied the motion. (ROA.414–16).

This appeal follows.

19

## SUMMARY OF THE ARGUMENT

I. The district court abused its discretion by denying Tiffany Fullerton's motion for new trial. The central issue at trial was whether Tiffany knowingly participated in her husband's fraudulent PPP loan scheme. After trial, the defense discovered new evidence directly supporting Tiffany's defense. Michael's PSR referenced the PSR from his 1999 federal bank fraud conviction, which stated Michael Fullerton had previously involved his ex-wife in a similar scheme without her knowledge. The district court erroneously concluded that this evidence was irrelevant and inadmissible, and that Tiffany failed to exercise due diligence in discovering it. Yet Tiffany had no access to the sealed 1999 PSR or reason to suspect a connection between Michael's past divorce and the current charges. This Court has also recognized the admissibility of similar evidence under Rule 404(b). Because this evidence goes directly to Tiffany's lack of intent and could have led to an acquittal, the district court's decision should be reversed.

II. The district court erred in applying a guideline enhancement for obstruction of justice based on its finding that Tiffany Fullerton willfully procured Michael Fullerton's perjured testimony. While Michael's testimony that Tiffany wasn't aware of the fraudulent scheme was ultimately rejected by the jury and deemed false by the

20

court, there is no evidence that Tiffany instructed, induced, or otherwise procured him to lie. Mere knowledge that a witness may offer false testimony is not suborning perjury. *See United States v. Johnson*, 352 F.3d 146, 149 (5th Cir. 2003). The district court's reliance on Michael's prior statements and pretrial communications does not establish that Tiffany orchestrated his testimony. The enhancement was improperly applied, and this Court should reverse.

III. The district court clearly erred by including the Starx Investment PPP loan in the loss calculation under USSG § 2B1.1. That loan was obtained before Tiffany Fullerton joined the conspiracy and cannot qualify as relevant conduct. While Tiffany may have known about the Starx loan, relevant conduct under USSG § 1B1.3 does not include actions taken by co-conspirators before a defendant's involvement, even if the defendant later learns of them. The Starx loan was distinct from the later loans Tiffany was involved in—it was applied for by another co-conspirator, using different methods, and at a time when there is no evidence Tiffany was participating in the scheme. Including this loan significantly inflated the loss amount and Tiffany's guideline range. Because the government failed to establish that the Starx loan was part of Tiffany's jointly undertaken criminal activity, the district court's loss determination should be reversed.

21

ARGUMENT

**I.    The district court abused its discretion when it denied Tiffany Fullerton's Motion for New Trial.**

The key question at trial was whether Tiffany had knowledge of the illegal nature of her husband's scheme and thus acted with intent to defraud. After trial, the defense found new evidence supporting Tiffany's theory—that Michael had done the same thing to his ex-wife. The district court found this evidence irrelevant. The district court was wrong. This Court should reverse.

**A. Standard of Review**

This Court reviews a district court's decision to deny a motion for new trial pursuant to Federal Rule of Criminal Procedure 33 for abuse of discretion. *United States v. Wall*, 389 F.3d 457, 465 (5th Cir. 2004). The Court is "necessarily deferential to the trial court because the appellate court has only read the record and, unlike the trial court, did not see the impact of witnesses on the jury or observe the demeanor of witnesses." *Id.* It reviews questions of law de novo. For mixed questions of law and fact, this Court reviews the underlying facts for abuse of discretion, but the conclusions to be drawn from those facts de novo. *Id.*

In evaluating whether to grant a motion for new trial, the Court applies "the *Berry* rule," which requires the defendant to demonstrate (1) the evidence is newly

22

discovered and was unknown to the defendant at the time of trial, (2) the failure to detect the evidence was not due to the defendant's lack of diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, and (5) the evidence would probably produce an acquittal if introduced at trial. *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011).

### B. Tiffany was not required to investigate Michael's 1996 divorce to exercise due diligence.

The district court determined that Tiffany failed to act with due diligence to discover the evidence from Michael's ex-wife because Michael had access to this information through his personal knowledge and the 1999 PSR. (ROA.414). Tiffany was also aware of Michael's criminal history. (ROA.414). But this is not an open and shut conclusion.

First, Michael's divorce took place two years before he was indicted for bank fraud and his ex-wife was not a co-defendant in that case. While Tiffany may have known Michael was married before and that Michael had a previous conviction, there is nothing to suggest she should have known the two events were connected. A scorched earth investigation interviewing all of Michael's ex-partners was not required for due diligence. *See Piazza*, 647 F.3d at 567–58 (holding defendant exercised due diligence when there was no indication before or during trial that a critical witness

23

had knowledge relevant to the case).

Second, Tiffany had no access to the 1999 PSR, which was kept under seal. The government did not show any evidence that Michael had access to it either. (ROA.402). In fact, it appears the government was unaware of it until Michael's current PSR issued. (ROA.402). And Michael pled guilty right before Tiffany's trial. Tiffany's counsel were not permitted to interview him before his plea. (ROA.402). After the plea, defense counsel interviewed Michael about his role in the scheme and Tiffany's knowledge. It was not incumbent upon them to ask him about his divorce from almost 30 years ago. And it is unsurprising that he would not volunteer information about his ex-wife's accusations of abuse shortly before his own sentencing. Tiffany didn't fail to exercise due diligence by not seeking a 25-year-old PSR or interviewing his ex-wife.

### C. Evidence that Michael tricked his ex-wife into assisting in a fraudulent scheme was material.

The district court concluded that the new evidence is not material and would not have likely produced an acquittal, pointing out that the ex-wife's statements were from over 20 years ago and Tiffany never claimed that she was coerced or abused. (ROA.414). But this Court has found that almost identical evidence may be relevant under Federal Rule of Evidence 404(b) to prove that a co-defendant had the

"opportunity and ability to concoct and conduct [a] fraudulent scheme" without the defendant-offeror's aid or participation. *United States v. Luffred*, 911 F.2d 1011, 1015 (5th Cir. 1990) (quoting *United States v. Cohen*, 888 F.2d 770 (11th Cir. 1989)). In *Luffred*, the defendant argued that the district court erred by refusing to issue subpoenas for the ex-wife and ex-girlfriend of her co-defendant, whom she claimed would have supported her defense "by testifying to his *modus operandi* of seeking out and defrauding vulnerable women." *Id.* This Court reversed the district court's finding that evidence of a co-defendant's prior bad acts was irrelevant. *Id.*

The critical question at trial was whether Tiffany knew that she was participating in fraud. Evidence that Michael used his previous wife to commit fraud without her knowledge is material to Tiffany's defense. *See United States v. Nachamie*, 101 F. Supp. 2d 134, 149 (S.D.N.Y. 2000) ("Nonetheless, the Court is hard pressed to say that Nachamie's prior conviction for conspiracy to commit health care fraud has no relevance to the question of whether Schrager was duped into joining the conspiracy. Nachamie's prior conviction ... does tend to prove that he successfully recruited doctors to participate in a similar scheme.").

### D. Michael's ex-wife's testimony is admissible.

Finally, the district court concluded that the evidence would be inadmissible

25

because the statements in the PSR are hearsay and, had Tiffany tried to call Michael's ex-wife to testify, the testimony would have been excluded as irrelevant and inadmissible under Rule 403 as to Tiffany's intent and knowledge. (ROA.415). But, as just discussed, that evidence *is* relevant. *See Luffred*, 911 F.2d at 1015. Rule 401 requires only minimal probative value. Fed. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact of consequences more or less probable than it would be without the evidence[.]"); *see also United States v. Leonard-Allen*, 739 F.3d 948, 956 (7th Cir. 2013) ("The word 'any' signals that evidence is relevant even if it only slightly or marginally alters the likelihood of a consequential fact."). This testimony could have rebutted the government's argument that Michael was lying to protect Tiffany. And as Tiffany's knowledge was the central concern, this testimony could have resulted in an acquittal.

## II.    The district court erroneously found that Tiffany willfully procured Michael's perjured testimony.

### A. Standard of Review

This Court reviews the district court's interpretation of the guidelines de novo and factual findings for clear error. *United States v. Le*, 512 F.3d 128, 134 (5th Cir. 2007). The defense preserved error by objecting below. (ROA.370–74).

26

**B. Knowledge that a witness will give false testimony is not obstruction of justice.**

Guideline 3C1.1 requires a two-level enhancement when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice[.]" USSG § 3C1.1. The application notes clarify that this adjustment applies to "committing, suborning, or attempting to suborn perjury ... if such perjury pertains to conduct that forms the basis of the offense of conviction." USSG § 3C1.1, n.4(B). The Supreme Court defines perjury as "a witness testifying under oath or affirmation ... [who] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). But courts are somewhat less clear and what constitutes suborning perjury.

There are of course obvious examples where the defendant tells a witness what to say on the stand. *E.g. United States v. Graves*, 5 F.3d 1546, 1555 (5th Cir. 1993) (defendant relayed one witness's grand jury testimony to another to make sure they would say the same thing); *United States v. Flanagan*, 484 F. App'x 973, 974–75 (5th Cir. 2012) (defendant gave false testimony at the request of his co-defendant); *United States v. Statin*, 367 F. App'x 492, 499 (5th Cir. 2010) (defendant convinced a witness to sign a letter with false statements). But this Court has also made clear that the fact

27

that the defendant calls a witness to the stand knowing they will give false testimony is not enough to prove she suborned perjury.

In *United States v. Johnson*, Johnson's twin sister testified at the felon-in-possession trial that she, not Johnson, had placed the gun in question under the mattress. 352 F.3d 146, 147 (5th Cir. 2003). Johnson herself testified that she did not know a gun was in the house. *Id.* But a rebuttal witness testified that the twin sister said she would take the blame for Johnson's gun charge. *Id.* Johnson was convicted and the district court applied the obstruction of justice enhancement, concluding the twin sister "came in here and lied and did it with [Johnson's] knowledge." *Id.* at 148. This Court held that the district court's conclusion was not a finding that Johnson "procured" her sister's testimony. *Id.* at 149. The fact that Johnson knew the testimony was false did not mean "that Johnson asked her sister to testify that she placed the firearm in the house[.]" *Id.* at 149 n.1.

The Fourth Circuit used similar logic to hold suborning perjury requires that the defendant "knowingly and willfully induced or procured the witness to give such false testimony." *Petite v. United States*, 262 F.2d 788, 794 (4th Cir. 1959). The Court held that the inducement requirement was not satisfied when the defendant simply "allowed his co-defendant" to give false testimony. *United States v. Lesczynski*, 86 F.

28

App'x 551, 555–56 (4th Cir. 2004) (holding evidence insufficient to establish the defendant induced or procured false testimony when the two may have shared a hotel before trial, the witness was the defendant's brother-in-law, and the witness was the only one called by the defense); *cf. United States v. Kilgarlin*, 157 F. App'x 716, 720 (5th Cir. 2005) (holding the defendant procured false testimony by telling the witness before trial what she needed to say for the defense).

The main issue at Tiffany's trial was whether she knew about the fraudulent scheme when she opened accounts and moved money. Michael testified that she didn't. The jury rejected Michael's testimony and the district court concluded he committed perjury. But the district court was wrong to conclude that Tiffany willfully procured false testimony.

The district court and defense counsel went back and forth over the definition of suborning perjury, though the court acknowledged the defense had made a very effective argument and "I think the Fifth Circuit perhaps needs to look at" the issue. (ROA.5586, 5592). The court relied on the fact that Michael sent text messages years before trial saying he would take the fall and that, in phone conversations with Tiffany before trial, Michael told her what her attorneys needed to ask him. The defense then called Michael as a witness "and asked him precisely the questions that need to be

answered to absolve your client that are the elements of the offense. He was called to answer those questions. He had telegraphed in advance that he was going to answer those questions with a lie. If that's not suborning perjury, I don't know what is." (ROA.5585). But there is no evidence Tiffany instructed Michael to lie or that she came up with his testimony. After Michael pled guilty, Tiffany's lawyers met with Michael and his lawyers "for two days about this whole thing. That's how we knew what questions to ask." (ROA.5593).

There must be some action beyond just knowing that a witness will give false testimony. *See Johnson*, 352 F.3d at 149; *see also United States v. Lowder*, 148 F.3d 548, 552 (5th Cir. 1998) (holding defendant procured false testimony by having defense counsel call witness to testify even after threats from the government about perjury). But that is what the district court found: Tiffany knew Michael would lie and Tiffany's lawyers spoke with Michael and called him as a witness. This does not meet the threshold for procuring false testimony. This Court should reverse.

## III. The district court erred when it included the Starx Investment PPP loan in the loss calculation.

### A. Standard of Review

This Court reviews the loss amount, a factual finding, for clear error. *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007). The defense preserved error by

30

objecting below. (ROA.4056).

### B. The Starx Investment loan doesn't qualify as relevant conduct because it occurred before Tiffany joined the conspiracy.

Guideline 2B1.1(b) provides that a defendant's offense level for fraud crimes increases depending on the extent of the monetary loss. USSG § 2B1.1(b)(1). "Loss" includes both actual and intended loss. *Id.* at (b)(1)(A). Probation attributed $3,792,651.11 of intended loss to Tiffany based on all the PPP loans, including Starx Investment, and added 18 levels. (ROA.4039).

Tiffany objected to the inclusion of the Starx Investment loan, prompting the government to argue it qualified as relevant conduct. (ROA.4056, 4060–62). The government claimed that the conspiracy was about fraudulently obtaining PPP loans, the Starx loan was fraudulently obtained, therefore the Starx loan qualifies as relevant conduct. (ROA.4061). The government also highlighted that Tiffany worked at Georgetown Collision and knew about the Starx PPP loan. (ROA.4061). Those facts are not enough to include the Starx loan under relevant conduct.

Relevant conduct holds a defendant responsible for all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by her. USSG § 1B1.3(a)(1)(A). It also holds a defendant responsible for all acts and omissions of others that were within the scope of the jointly undertaken

31

criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity that occurred during the commission of the offense of conviction. *Id.* § 1B1.3(a)(1)(B). That said, the scope of the jointly undertaken criminal activity is not necessarily identical to the scope of the entire conspiracy; the scope is limited by the defendant's agreement to jointly undertake the particular criminal activity. *Id.* § 1B1.3, n.3(B). And relevant conduct does not include the conduct of co-conspirators before the defendant joining the conspiracy, even if she knows about that conduct. *Id.*; *see also United States v. Carreon*, 11 F.3d 1225, 1235 (5th Cir. 1994) (holding "the base offense level at sentencing cannot be based on mere knowledge of historic facts").

The Starx Investment PPP loan application stands apart from the rest. It was the first one filed and the only one based on a functioning business with employees. Starkes alone communicated with the bank to get the right paperwork together to get the application finalized. (ROA.4662). The application was handwritten and submitted by Starkes himself. (ROA.4844–45). On the other hand, the rest of the loans were done by Michael via DocuSign. (ROA.4850). They escalated the scheme, incorporating entities that didn't even have employees.

The first evidence of Tiffany's involvement came with the third loan for FCG

32

Automotive. The application was done via DocuSign in Tiffany's name, though it looked exactly like the other ones Michael had done. (ROA.658–62). The loan money went into Tiffany's personal bank account and then was transferred to a new account opened for FCG Automotive by Tiffany. (ROA.4705–06). But there is no evidence that Tiffany was involved with the scheme before that application, and not when the Starx application was filed.

The government argued that Tiffany was part of the Georgetown Collision management team and knew about the loan. (ROA.4061). But everyone at Georgetown Collision knew about the loan because Michael told all the employees they were getting the loan to continue making payroll. (ROA.5188). And Tiffany's knowledge of the loan isn't enough. There still must be evidence that she was part of the conspiracy when it was obtained. *See United States v. Longstreet*, 603 F.3d 273, 278–79 (5th Cir. 2010) (holding "absent particularized findings" that the defendant was involved in her co-defendants past activities, the district court had no basis for assessing a guideline enhancement for relevant conduct). While the government emphasized Tiffany's role in moving funds obtained from the other PPP loans, it did not put on evidence of her involvement with the funds from the Starx loan.

Without the Starx loan included in the loss calculation, Tiffany's offense level

would be 27 and her guideline range would be 70–87 months. *See* USSG § 2B1.1(b)(1); (ROA.4039). Even with the obstruction enhancement, her guideline range would be 87–108 months. The loss calculation error harmed her, and this Court should reverse.

CONCLUSION

Tiffany Lynn Smith Fullerton respectfully asks this Court to reverse.

Respectfully submitted,

/s/Jessica Graf
JESSICA GRAF, PLLC
TX BAR NO. 24080615
11430 Quaker Ave
Ste 200 PMB 1027
Lubbock, TX 79424

### CERTIFICATE OF SERVICE

I certify that on May 23, 2025, I filed this brief electronically in the Court's ECF system. Opposing counsel has therefore been served pursuant to Fifth Circuit Rule 25.2.5. I further certify that: 1) any required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper document; and 3) this document has been scanned for viruses by the following commercial virus scanning program: McAfee LiveSafe, and it is free of viruses.

/s/ Jessica Graf

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies this brief complies with the length limitation announced in Rule 32(a)(7)(B), because it contains 6,742 words.

This brief complies with the typeface and type style requirements because it has been prepared in Microsoft Word using the proportionally spaced typeface Goudy Old Style, in a 14-point font size in the body of the brief, and a 12-point font size in the footnotes.

The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the length limitations in Federal Rule of Appellate Procedure 32(a)(7), may result in the Court striking the brief and imposing sanctions against the person signing the brief.

/s/ Jessica Graf